UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL FOSTER, | ) | Case No.: 1:12-CV-3129 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| JASON BUNTING, Warden, | ) | **Report and Recommendation of** |
| | ) | **Magistrate Judge** |
| | ) | |
| Respondent. | ) | |

The above-captioned case is before the Court on Petitioner Michael Foster's ("Petitioner") Motion for the Appointment of Counsel, Motion to Expand the Record, and Motion for Completion of the Record for Traverse.  ECF Dkt. #s 13, 14, 16.  In responding to Petitioner's motions, Respondent Jason Bunting, Warden of the Marion Correctional Institution ("Respondent") where Petitioner is housed, asserts that Petitioner has procedurally defaulted the second through sixth grounds for relief that he presents in his federal habeas corpus petition and further asserts that Petitioner's assertions of actual innocence do not warrant review of his grounds for relief.  ECF Dkt. #15 at 2.

Since Respondent has raised procedural and substantive grounds as to Petitioner's federal habeas corpus petition in responding to Petitioner's motions, the undersigned undertakes review of Petitioner's federal habeas corpus petition, Respondent's return of writ, and Petitioner's traverse in conjunction with Petitioner's motions and Respondent's responses.  Based upon this review, as well as Petitioner's pending motions, and for the following reasons, the undersigned recommends that the Court find that Petitioner has procedurally defaulted his second through sixth grounds for relief and has failed to establish a fundamental miscarriage of justice or actual innocence in order to warrant review of any grounds for relief in his petition. Accordingly, the undersigned recommends that the Court DISMISS Petitioner's federal habeas corpus petition in its entirety and deny all of Petitioner's pending motions.  ECF Dkt. #1, 13, 14, 16.

## I.       SYNOPSIS OF THE FACTS

The Eighth District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-361 (6th Cir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999).  As set forth by the Ohio Court of Appeals, the facts are:

On August 3, 2001, the Miles Eagle Supermarket ("Miles store") was robbed at gunpoint.  The victim, Anwar Hamed, was shot twice during the course of this robbery, in his shoulder and in his back, and as a result, was rendered a paraplegic.  Hamed died in March 2007.  In August 2008, defendant-appellant, Michael Foster (referred to as "Michael" or "Foster)", was indicted on multiple counts relating to the aggravated robbery of the Miles store in 2001 and Hamed's death nearly six years later.

\*       \*       \*

The state presented 16 witnesses against Foster.  The facts established that on August 3, 2001, at least two men robbed the Miles store at gunpoint, just after it opened.  Hamed, whose family owned the business, was shot first in his shoulder and then in his back.  As a result, he became paralyzed from the waist down.  When police officers arrived on the scene, they found Hamed lying on the floor near the back of the store.  Hamed told them that there were four men who robbed the store and the one who shot him was "a black male, about 5'7", a ski mask, and ski goggles."

At the hospital a couple of weeks later, Hamed gave police a statement where he said that it was three men who robbed the store.  As for the shooter, Hamed said that "he came in, he had goggles on, they were clear, I could see him clearly, and shoots me right in the shoulder, I tried to run and he shoots me in the back.  I fell on the ground, my gun fell from my waist and I couldn't move no more[.]"  Hamed described the shooter's goggles are "clear, maybe safety or motorcycle goggles."  Hamed further told police that the shooter demanded Hamed give him the keys to the office, which Hamed did.

Hamed said the men took his gun, wallet, and credit cards.  Police officers also learned from Hamed's brother that 20 cartons of cigarettes were taken, as well as approximately $5,000.

Detective Joseph Daugenti testified that he was assigned the case on August 4, 2001, the day after Hamed was shot. Detective Daugenti explained that he was aware that James Sheron had been named as a suspect in another aggravated robbery case near the Miles store. Because of this, Detective Daugenti created a photo array with Sheron's picture and showed it to Hamed at the hospital.  Detective Daugenti explained that although Hamed had described his shooter as wearing a ski mask, Hamed had told him that he was still able to get a good look at the person who shot him. Detective Daugenti testified that Hamed "immediately without hesitation" chose Sheron as the person who shot him. In Hamed's statement to police, he said that he was "totally positive[,] absolutely positive," that it was Sheron who shot him, and that he had "no doubt."

-2-

Detective Daugenti further testified that as a result of Hamed's identification of Sheron, Sheron was arrested. Detective Daugenti attempted to interrogate Sheron when he was in custody, but Sheron vehemently denied that he did it and became somewhat violent, hitting the table and yelling, so Detective Daugenti ended his interrogation.

As part of his investigation, Detective Daugenti contacted CitiBank to obtain Hamed's credit card report. He learned that Hamed's credit card had been used three places on the day of the shooting: a Sunoco gas station, the Maple Town Bi-Rite at 12:50 p.m., and a Super K-Mart on Warrensville Center Road at 2:56 p.m. He obtained sales receipts from the Bi-Rite and the K-Mart, matching the times from the credit card report. He further obtained a list of the UPC codes of the items purchased at both stores.

Detective Daugenti said that after he received the UPC codes of the items purchased with Hamed's credit cards, he obtained consent to search Sheron's home from Sheron's mother. Detective Daugenti was looking for the items purchased at the Bi-Rite or K-Mart. But he was unable to find any evidence.

Detective Daugenti also obtained videos from K-Mart security cameras. One of the videos shows two black males wearing baseball hats in the check-out line at almost the exact time Hamed's credit card was used.

Several police officers testified that on September 13, 2001, they responded to a call that an aggravated robbery had taken place at the Greenlite Beverage store ("Greenlite store"). Dispatch further described the vehicle involved as a small blue car and broadcasted the car's license plate number.

When officers arrived at the store, they found two men who had been handcuffed and robbed. The victims told the officers that two men had come into the store, put handcuffs on them, took their wallets, money from the register, and alcohol.

Other officers were patrolling the area looking for a car that matched the description. Sergeant Pat Putnam saw a blue car pulling out of the Cleveland Motel. He verified that the plates matched the license plate number that was broadcast over the radio. He followed the vehicle and notified other officers. He lost sight of the vehicle in a residential neighborhood, but other officers soon saw it and stopped it.

Michael Foster was the sole occupant of the blue car when police stopped it. Police found an identification card and a credit card belonging to one of the robbery victims from the Greenlite store in Michael Foster's pocket. On the back seat of the blue car, police found a black "suitcase-type bag" with two handguns inside the bag, a Taurus .38 revolver and a Smith & Wesson revolver. There were also several hats and various items of clothing in the car. Michael Foster was the registered owner of the blue car.

Because officers knew that Michael Foster had been at the Cleveland Motel, they went back to it and discovered that his brother, Lamont Foster ("Lamont"), was staying there. Police knocked on Lamont's door. Lamont let them in and cooperated with the officers, letting them in the room to search it.

-3-

In the ceiling tiles of the room, police found two wigs and a Baltimore Ravens baseball hat wrapped up inside a shirt. In the dumpster behind the hotel, officers also found a bag containing a wallet and keys belonging to one of the robbery victims from the Greenlite store.

On November 6, 2001, Detective Daugenti received a tip that Michael Foster was involved in the Miles store robbery. Michael Foster was already in custody on other charges (relating to the Greenlite store robbery) at that time. Detective Daugenti interviewed Michael and testified that Michael told him that he was involved in the Miles store robbery, but that he was "basically the lookout," and that it was his two brothers who actually robbed the store, Lamont and Gilbert Foster.

After talking to Michael, Detective Daugenti learned from Gilbert Foster's employer that Gilbert had been at work at the time of the Miles store robbery. Detective Daugenti then attempted to speak with Lamont, who was also in custody at that time (for the Greenlite store robbery), but Lamont would not talk to him.

Detective Daugenti interviewed Michael again in late November 2001. At that time, Michael agreed to give him a written statement regarding the Miles store robbery. Michael told Detective Daugenti that Lamont and Gilbert came to his house and wanted to use his car, but did not tell him why. Lamont then secretly told Michael that he and Gilbert were going to rob the Miles store. Michael said that Lamont and Gilbert then left his house and Michael followed them. Michael "took the railroad tracks," and "sat right across the street from the supermarket on the tracks." Michael stated, "[Lamont] went into the back door and Gilbert went in the front so I started walking across the street. At first I did not think they were going to do it. I saw [Hamed]. Looked like he was near the back door when he started running. He was screaming, then [Lamont] was chasing behind him and started shooting."

Michael further told Detective Daugenti that "[Lamont] shot twice and Gil was already inside the store. They had to be standing over him. You could hear [Hamed] yelling in Arabic language then Gil grabbed [Lamont.] From what I found out later, [Lamont] was going to shoot [Hamed] in the head because [Hamed] was talking in Arabic and was not telling him where the money was. Gil grabbed the keys from [Lamont] and went *** to the check cashing booth. He was up there for a minute and came back with some stuff. [Lamont] was at the register taking money out of the register. That is when I went back to my house. That is all I seen at that point."

Detective Daugenti testified that Michael also told him that he knew Lamont took a .38 caliber gun from Hamed and that Lamont shot Hamed with a .38, but Michael said he did not know what happened to the gun. Michael further told Detective Daugenti that after the robbery, Lamont and Gil were laughing about shooting Hamed because he was "screaming in his native tongue." Michael also knew that Lamont and Gil took "cash, some cigarettes and coins, a bunch of rolled up coins," from the Miles store.

Detective Daugenti later learned that Michael lived with Angelica Weaver around the time of the Miles store robbery. Weaver admitted that Michael had lived with her, and she gave Detective Daugenti consent to search her home. Detective Daugenti found several items in the home with UPC codes that matched UPC codes on items purchased with Hamed's credit card

on August 3, 2001 at the Bi-Rite and K-Mart, including a bottle of Heinz ketchup, empty bottles of Scope, Folgers coffee, deodorant, Quaker grits, three packages of frozen meat, razors, and three packages of boxer briefs.

Lamont testified that he agreed to testify against his brother, Michael, in exchange for being charged with involuntary manslaughter for the death of Anwar Hamed. In exchange, Lamont would not receive additional prison time for the conviction.

Lamont testified that on August 2, 2001, Michael called him and said that he wanted to rob the Miles store. Lamont said that he did "not want to rob that one because it's the next street away from [his] mother's house and sometimes she asked [him] to go to that store." But Lamont later agreed to rob the Miles store.

The following morning, Lamont explained that he went to Angie's house, where Michael was staying. Michael gave him the "bowling bag" that they "kept the guns in." They had two .38 revolvers. They both had gloves, wigs, and handcuffs. They drove to the Miles store in Michael's blue car.

They went inside the store and Hamed was standing in the aisle. They told Hamed to put his hands in the air, while pointing their guns at him. Hamed complied with the order at first, but then began yelling in Arabic and dropped his hands. When Hamed dropped his hands, Lamont said that he "heard a shot from behind [him]." Hamed fell to the ground and Lamont said that he saw Michael walk up to Hamed and shoot him again.

Lamont testified that he proceeded to remove money from the cash register. Michael took a gun and keys from Hamed, and he opened the cash-checking "booth" where they believed they would find more cash. While Michael was in the cash-checking booth, Lamont watched the front door. They were only able to get $40 from the cash-checking booth. They then left the store.

After the robbery, Lamont stated that he gave his gun back to Michael because Michael was the one who wiped the guns down and stored them in the bowling bag. Lamont testified that Michael would collect the guns "every time after we would do something."

Lamont said he learned that Michael also took Hamed's credit card because Michael later used the card to purchase food and other items. Lamont said he was mad because he had used his own money to purchase food.

Lamont testified that he was arrested for the Greenlite store robbery in September 2001 at the Cleveland Motel. Lamont explained that Michael had just dropped him off before the police arrived at his room. Lamont thought that the police might show up at his room because he heard police sirens and tires screech and figured that Michael had been arrested. Lamont said he could not leave because there was a police car in the parking lot. Lamont hid money and liquor in the ceiling tile of the room. Lamont also shaved because he was trying to change his appearance so that he could "make a get away."

Lamont identified a .38 Taurus Special that he said Michael "took from the Citgo gas station," that the two of them had robbed on August 24, 2001. [Fn 1] The state played a video for the jury from the robbery at the Citgo gas

-5-

station. Lamont identified himself and Michael in the video. They were both wearing baseball hats. Lamont explained that it was he who walked in first and pulled a gun, and Michael walked in second, carrying the black bowling-ball bag. Lamont said he also handcuffed the clerk at the Citgo. Lamont testified that he pleaded guilty "to the Citgo robbery."

> Fn 1.  It was Detective Daugenti who testified to the type and brand of gun, as well as the date the Citgo gas station was robbed.

Lamont pleaded guilty to attempted murder, aggravated robbery, and felonious assault with gun specifications for the robbery at the Miles store. He had been in prison since February 2002 for these crimes. He had never been charged with the death of Anwar Hamed, and as of the day he testified, there were no pending charges against him relating to the death of Hamed.

Dan Galita, M.D., forensic pathologist and deputy coroner, testified that Anwar Hamed died on March 21, 2007, at 12:27 a.m. Dr. Galita performed an autopsy on Hamed on March 22, about 33 hours after Hamed had passed away. He explained that Hamed had five Fentanyl patches on his back that were 100 micrograms per hour patches. [Fn 2] Hamed's physician, Dr. Douglas Vanauken, testified that in the fall of 2006, he began prescribing Hamed two Fentanyl patches every three days.] Hamed had severe coronary atherosclerosis (hardening of the arteries), and a severe infection in both lungs, or acute bronchopneumonia. Dr. Galita explained that he recovered a bullet from Hamed's left lung.

> Fn. 2.  Hamed's physician, Dr. Douglas Vanauken, testified that in the fall of 2006, he began prescribing Hamd two Fentanyl patches every three days.

Hamed's toxicology report showed that he had the following in his system: Amitriptyline, Bupropion, and Citalopram, which are all antidepressants; Diazepam, which is a sedative; Nortriptyline, an antidepressant; and Fentanyl, which is a narcotic pain killer. Dr. Galita testified that Hamed had 73 nanograms per milliliter of Fentanyl in his system, which he described as "very high." But Dr. Galita explained that the number was "abnormally artificially high" because Hamed's body continued to absorb Fentanyl through the patch for up to 12 hours after his death, but the drug was not metabolized.

Dr. Galita ruled out Fentanyl overdose because there was nothing in Hamed's medical records to indicate that he had "wooden chest syndrome." He explained that when people overdose on drugs, their chests become very stiff and their breathing becomes very shallow, short, and slow. Dr. Galita said that Hamed's medical records indicated that when he arrived at the hospital, he had hyperventilation because his breathing was very deep and very rapid. This was "typical for an individual who has a lung infection and doesn't have enough oxygenation because of the infection in the lungs."

Dr. Galita explained that people who are paralyzed are "predisposed" to lung infections. He said that is why patients who have surgery are immediately mobilized, to prevent lung infections and blood clots. He further explained that when a patient has a severe lung infection, oxygen cannot get to the blood because of the infection in the lungs and then the organs are deprived of oxygen.  The patient dies from lack of oxygen.

-6-

Dr. Galita testified that because Hamed was paralyzed from the waist down, he developed a lung infection from being bedridden and wheelchair ridden for a long period of time. Dr. Galita concluded that "the cause of death was acute bronchopneumonia due to paraplegia, due to remote gun shot wound of lumbar spine with spinal cord injury, and the manner of death was ruled as a homicide while at work."

The bullet that Dr. Galita removed from Hamed was tested in the police department's forensic lab. The bullet matched a test-fired bullet from the Smith & Wesson .38 revolver that was found in the black bowling bag in the back of Michael Foster's vehicle on September 13, 2001.

Michael Foster presented Dr. Robert Bux, M.D., to testify for him. Dr. Bux testified that he is a physician, a board certified anatomical clinical and forensic pathologist, and the elected coroner in El Paso County, Colorado. He testified that he coauthored an article on Fentanyl overdoses that was in the process of being published.

Dr. Bux testified that because Hamed's spinal injury was in the lower back, causing him to be paralyzed from the waist down, it would not affect his respiratory system. Dr. Bux explained that "Fentanyl is a very, very potent narcotic" that is "many times more powerful than morphine." He found the level of Fentanyl in Hamed's blood to be "an extremely high lethal dose." He explained that it was the second highest dose he had ever seen. He explained that even if a person had a high tolerance to Fentanyl, he would expect the range to be "five to maybe seven, maybe eight, but certainly no higher than that." He opined that Hamed's cause of death was "due to massive drug overdose and pneumonia, * * * independent of the gunshot wound."

ECF Dkt. #6-1 at 292-309.

## II.    **PROCEDURAL HISTORY**

### A.    **State Trial Court**

In its May 2008 term, the Cuyahoga County, Ohio Grand Jury indicted Petitioner on: one count of aggravated murder in violation of Ohio Revised Code ("ORC") § 2903.01(B) with two firearm specifications, a notice of prior conviction ("NPC") specification, and a repeat violent offender ("RVO") specification; one count of aggravated murder in violation of ORC § 2903.01(A) with two firearm specifications, one NPC specification, and one RVO specification; one count of aggravated robbery in violation of ORC 2911.01(A)(1) with two firearm specifications, one NPC specification and one RVO specification; one count of aggravated robbery in violation of ORC § 2911.01(A)(3) with two firearm specifications, one NPC specification, and one RVO specification; one count of having a weapon while under disability in violation of ORC § 2923.13(A)(2); and one count of receiving stolen property in violation of ORC § 2913.51(A).  ECF Dkt. #6-1 at 4-12.

Petitioner waived his right to a jury trial on the charge of having weapons while under disability and on the RVO specifications.  ECF Dkt. #6-1 at 179-180.  On the other charges, Petitioner had a jury trial and the jury found him not guilty of aggravated murder, but guilty of the lesser included offense of murder in violation of ORC § 2903.02 with two firearm specifications, and a NPC specification, guilty of two counts of aggravated robbery with two firearm specifications and the NPC specification, and guilty of receiving stolen property.  *Id.* at 183.  The court thereafter found Petitioner guilty of having a weapon while under disability and guilty of the RVO specifications.  *Id.*  On May 7, 2010, the trial court sentenced Petitioner to a total term of imprisonment of fifty-three years to life.  *Id.* at 185.

**B**.  **Direct Appeal**

On June 1, 2010, Petitioner, through counsel, filed a notice of appeal and asserted the following assignments of error:

FIRST ASSIGNMENT OF ERROR

The State failed to present sufficient evidence to sustain a conviction against Appellant.

SECOND ASSIGNMENT OF ERROR

Appellant's convictions are against the manifest weight of the evidence.

THIRD ASSIGNMENT OF ERROR

The trial court erred when it admitted other acts testimony in violation of R.C. 2945.59, Evid. R. 404(B) and Appellant's rights under Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.

FOURTH ASSIGNMENT OF ERROR

The trial court committed reversible error when it failed to give the jury the accomplice testimony instruction.

FIFTH ASSIGNMENT OF ERROR

Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments of the U.S. Constitution.

ECF Dkt. #6-1 at 191.  Petitioner filed a pro se supplemental brief setting forth additional assignments of error including prosecutorial misconduct, ineffective assistance of counsel, and abuse

-8-

of discretion by the trial court and an administrative judge.  *Id.* at 266.

On June 9, 2011, the Ohio appellate court affirmed the trial court's judgment and sentence, overruling Petitioner's assignments of error.  ECF Dkt. #6-1 at 292.

### C.   Supreme Court of Ohio

On July 25, 2011, Petitioner, through new counsel, filed a notice of appeal to the Supreme Court of Ohio.  ECF Dkt. #6-1 at 319.  He presented the following propositions of law in his memorandum in support of jurisdiction:

> Proposition of Law No. I:
>
> The evidence was insufficient to prove that Mr. Foster caused the death of Hamed beyond a reasonable doubt.
>
> Proposition of Law No. II:
>
> A reviewing court should not treat evidence of another crime as "direct" evidence when the evidence is merely cumulative on the issue and is otherwise improper.
>
> Proposition of Law No. III:
>
> UPC bar codes are not "fingerprints," so the failure to give an instruction as to the credibility of a witness who received leniency in return for testimony was plain error and the result of the ineffective assistance of counsel.  R.C. 2923.03(D).

ECF Dkt. #6-1 at 322.

On November 2, 2011, the Supreme Court of Ohio denied Petitioner leave to appeal and dismissed Petitioner's appeal as not involving any substantial constitutional question. ECF Dkt. #6-1 at 383.

### D.   Application for Reopening under Rule 26(B) of Ohio Rules of Appellate Procedure

On August 31, 2011, while his appeal before the Supreme Court of Ohio was pending, Petitioner filed an application for reopening with the Eighth District Court of Appeals.  ECF Dkt. #6-1 at 384.  Petitioner alleged that he received the ineffective assistance of counsel because the trial court erred by not acknowledging his request to appoint new counsel, trial counsel failed to raise the issue of prosecutorial misconduct and multiplicity of indictment, trial counsel failed to request DNA testing of a Baltimore Ravens hat used as evidence, trial counsel failed to seek a suppression hearing regarding signed statements of Petitioner based upon the fact that he was

forced to sign such statements, and trial counsel failed to request jury instructions concerning the credibility of witnesses who received leniency in return for their testimony.  *Id*. at 384-393.

On March 7, 2012, the Ohio appellate court denied Petitioner's application for reopening after addressing each of Petitioner's assignments of error.  ECF Dkt. #6-1 at 457-466.

On April 10, 2012, Petitioner filed a notice of appeal to the Supreme Court of Ohio with a memorandum in support of jurisdiction.  ECF Dkt. #6-1 at 468-470.  Each of Petitioner's propositions of law before the Supreme Court of Ohio were those presented to the Ohio appellate court in his Rule 26(B) application for reopening.  *Id*. at 471.

On June 20, 2012, the Supreme Court of Ohio dismissed Petitioner's appeal as not involving any substantial constitutional question.  ECF Dkt. #6-1 at 494.

**III.**  **INSTANT FEDERAL HABEAS CORPUS PETITION**

On December 21, 2012, Petitioner Michael Foster filed a pro se federal habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his Cuyahoga County Common Pleas Court convictions for murder with a firearm specification with specifications, two counts of aggravated robbery with specifications, receiving stolen property, and having weapons while under disability with a specification.  ECF Dkt. #1.  Petitioner presents the following grounds for relief in his federal habeas corpus petition:

> Ground One:
>
> Mr. Foster is actually innocent of the counts of murder and aggravated robbery charged in the indictment.
>
> Ground Two:
>
> Mr. Foster was denied effective assistance of counsel, where counsel failed to present evidence the decedent was a known drug seeker and the ER physician diagnoised[sic] the decedant[sic] with physical signs of opium overdoses.
>
> Ground Three:
>
> Mr. Foster was denied effective assistance of counsel where such counsel failed to present evidence of medical error by the ER physician which contributed to the decedant's[sic] death.
>
> Ground Four:
>
> Mr. Foster was denied due process when the prosecution failed to present sufficient evidence to sustain a conviction.

-10-

Ground Five[1]:

Mr. Foster was denied due process when the prosecution knowingly used perjured testimony to obtain a conviction.

Ground Six[2]:
Mr. Foster was denied due process when the trial court prohibited the defense from using the decedent's statement to cross exam key witnesses.

*Id.* at 6-30.  On February 20, 2013, this case was automatically referred to the undersigned pursuant to Local Rule 72.2.  On April 24, 2013, Respondent Jason Bunting, Warden of the Marion Correctional Institution, in Marion, Ohio filed a return of writ.  ECF Dkt. #6.  On September 19, 2013, Petitioner filed a traverse to the return of writ.  ECF Dkt. #11.

On September 19, 2013, Petitioner also filed the instant motion for appointment of counsel and motion to expand the record.  ECF Dkt. #13, 14.  On September 23, 2013, Respondent filed a brief in opposition to Petitioner's motions.  ECF Dkt. #15.  On October 10, 2013, Petitioner filed a motion for completion of the record.  ECF Dkt. #16.

**IV**.    **PROCEDURAL BARRIERS TO REVIEW**

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

**A.**    **Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. § 2244(d)(1).  The AEDPA statute of limitations is not currently at issue in this case.

---

[1]Petitioner mistakenly labels this Ground for Relief as number 4.  ECF Dkt. #1 at 27.

[2]Petitioner mistakenly labels this Ground for Relief as number 5.  ECF Dkt. #1 at 29.

-11-

**B.**     **Exhaustion of State Remedies**

As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated. *McMeans*, 228 F.3d at 681 citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).

In order to have fairly presented the substance of each of his federal constitutional claims to the state courts, the petitioner must have given the highest court in the state in which he was convicted a full and fair opportunity to rule on his claims. *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A petitioner fairly presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir. 1993) cert. denied, 509 U.S. 907 (1993)(quotation omitted). "Once a federal claim has been 'fairly presented' at the first possible opportunity within 'one complete round of the State's established appellate review process,' the claim has been exhausted." *Carter v. Mitchell*, 693 F.3d 555, 564 (6th Cir. 2012), citing *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir.2004); *Clinkscale*, 375 F.3d at 437. If a petitioner failed to exhaust his state remedies and state law would no longer permit him to raise the claim, the claim is procedurally defaulted. *Williams*, 380 F.3d at 967.

-12-

The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist." *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), overruled in part on other grounds, *Fay v. Noia*, 372 U.S. 391 (1963). A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991). A federal habeas court may grant a writ of federal habeas corpus in the absence of a showing of cause and prejudice only in an extraordinary case, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

### C.     Procedural Default

The procedural default doctrine serves to bar review of federal habeas corpus claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730. For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (emphasis removed). When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991). In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary. *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit established a four-pronged analysis to determine whether a claim has been procedurally defaulted under *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have

-13-

complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman,* 501 U.S. at 729-30; *Richey v. Mitchell*, 395 F.3d 660, 678 (6th Cir. 2005)("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises). Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson*, 384 F.3d at 313-14. Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), cert. denied, 490 U.S. 1068 (1985). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel*, 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).

The above standards apply to the Court's review of Petitioner's claims.

## V.      STANDARD OF REVIEW FOR MERITS OF GROUNDS FOR RELIEF

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), cert.

-14-

denied, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000). Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A.  Decisions of lower federal courts may not be considered.

B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.  The state court decision may be overturned only if:

    1.  It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

    2.  the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

    3.  'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

    4.  the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.  Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.  Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall,* 744 F.2d 44, 46 (6th Cir. 1984), cert. denied, 469 U.S. 1221 (1985); *see also Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

    (e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

-16-

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), cert. denied, 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), cert. denied, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).

## VI.    PROCEDURAL DEFAULT-GROUNDS FOR RELIEF TWO THROUGH SIX

Respondent contends that Petitioner has procedurally defaulted Grounds for Relief Numbers Two, Three, Four, Five, and Six.  ECF Dkt. #6 at 16-21.  He notes that Petitioner raised none of these Grounds for Relief in his direct appeal and Petitioner himself admits that these Grounds were not raised in the state courts.  *Id.*

### A.    FAILURE TO RAISE GROUNDS FOR RELIEF

The undersigned recommends that the Court find that Petitioner has procedurally defaulted Grounds for Relief Numbers Two through Six.  "[A] petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedure.'"  *Carter*, 693 F.3d at 563-564 (quoting *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006)(quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 847, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).  In his second ground for relief, Petitioner asserts the ineffectiveness of trial counsel in failing to present evidence that the victim was a known drug seeker and that the emergency room physician diagnosed the victim with physical signs of opiate overdose.  ECF Dkt. #1 at 22-23.  A review of the appellate brief filed by Petitioner's counsel shows that this assertion was not presented as an assignment of error before the Ohio appellate court.  ECF Dkt. #6-1 at 191, 227-229.  The undersigned notes that Petitioner did mention an issue similar to his second ground for relief in his pro se supplemental appellate brief that the Ohio appellate court granted him leave to file.  *Id.* at 261, 519.  However, the State moved to strike Petitioner's pro se supplemental appellate brief when it filed its answer brief to

-17-

Petitioner's appellate brief.  *Id.* at 275.  The State argued that Petitioner's pro se appellate brief failed to follow the Ohio Rules of Appellate Procedure in that he did not delineate assignments of error or issues presented as required by the Rules and he failed to timely file his brief.  *Id.* The Ohio appellate court granted the State's motion and struck Petitioner's pro se appellate brief.  *Id.* at 518.  Accordingly, the appellate court's decision addressed only those assignments of error presented by Petitioner's counsel on appeal.  *Id.* at 292-318.  Accordingly, the Court should find that this ground for relief is procedurally defaulted since Petitioner has failed to fairly present this claim to the Ohio appellate court on direct appeal, in a Rule 26(B) application, or to the Supreme Court of Ohio, and he cannot return to the state courts in order exhaust this claim.

Similarly, in his third ground for relief before this Court, Petitioner asserts the ineffectiveness of trial counsel in failing to present evidence of medical error committed by the emergency room physician which he believed contributed to the death of the victim.  ECF Dkt. #1 at 23-27.  This issue was not raised before the Ohio appellate court.  ECF Dkt. #6-1 at 191, 227-229.  Nor was it raised before the Supreme Court of Ohio on direct appeal.  *Id.* at 323, 334. And Petitioner did not raise it in any other subsequent filing in state court.  *Id.* at 384-393, 471. The undersigned therefore recommends that the Court find that Petitioner has procedurally defaulted this ground for relief.

As to his fourth ground for relief alleging a denial of due process based upon the insufficiency of the evidence, Petitioner did present this issue as his first assignment of error in his appellate brief.  ECF Dkt. #6-1 at 191.  However, the Ohio appellate court determined that all of the arguments presented by Petitioner concerning this assignment of error really were actually manifest weight of the evidence arguments and not related to the sufficiency of the evidence.  *Id.* at 315.  The appellate court thus addressed the assignment of error in conjunction with Petitioner's manifest weight of the evidence assignment of error.  *Id.* at 315-317.  Petitioner also presented insufficiency of the evidence as a proposition of law on appeal to the Supreme Court of Ohio, but that court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  *Id.* at 333, 383.  A review of Petitioner's appellate brief confirms that his assignment of error labeled insufficiency of the evidence did in fact assert

-18-

manifest weight of the evidence arguments since it challenged the credibility of the evidence presented as opposed to the sufficiency of the evidence.  Thus, the undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief.

Petitioner's fifth ground for relief before this Court alleges that he was denied due process when the prosecution used the perjured testimony of Detective Daugenti  in order to secure his conviction.  ECF Dkt. #1 at 27.  Petitioner complains that the prosecution knowingly allowed Detective Daugenti to falsely testify that he found several items in Petitioner's home that matched the items identified on sales receipts that he obtained from two stores where the victim's credit card was used after the victim indicated that the shooter had taken his credit card. *Id*.  Petitioner contends that the prosecution knew that no factual basis existed to prove that the items found in Petitioner's home were the exact items purchased with the victim's credit cards because UPC codes contain no data or product information.  *Id*.  This issue was not presented to the Ohio appellate court.  *Id*. at 191, 216-229.  In his brief to the Supreme Court of Ohio, Petitioner raised an issue regarding UPC codes, but only in conjunction with an ineffective assistance of counsel claim when counsel failed to request an accomplice jury instruction at trial. *Id*. at 334-335.  This is not the same constitutional theory upon which Petitioner presents his fifth ground for relief before this Court.  Accordingly, the undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief.  Moreover, as Respondent alternatively asserts, even if Petitioner had fairly presented this ground for relief before the Supreme Court of Ohio, procedural default still applies because if a constitutional claim is presented to the Supreme Court of Ohio without presentation to the appellate court, the Ohio Supreme Court will not consider it. *See Eskridge v. Konteh*, 88 F. App'x 831, 838 (6th Cir.2004) (citing Ohio cases).    In his sixth ground for relief, Petitioner asserts that he was denied due process when the trial court barred the defense from using the victim's statement to cross-examine key witnesses.  ECF Dkt. #1 at 29-30.  Petitioner contends that his brother Lamont provided direct testimony that he saw Petitioner standing over the decedent and shoot him execution style, but the defense was not allowed to use the decedent's statement to the detective that he was shot in the back. *Id*.  Petitioner failed to present this issue to the Ohio appellate court

or the Supreme Court of Ohio. *Id*. at 193, 216-229, 333-335. Petitioner does make a claim regarding failure to disclose the victim's statement in his Rule 26(B) brief as an assignment of error. *Id*. at 390-391. However, he presents the claim as an allegation of the ineffectiveness of appellate counsel in failing to raise a claim of prosecutorial misconduct. *Id*. Petitioner argues that the State committed misconduct by withholding the signed statement of the victim from the defense and his counsel was ineffective in failing to raise this issue. *Id*. Here, Petitioner asserts that the trial court denied him a fair trial by denying defense counsel the right to use the decedent's statement to cross-examine Lamont and Detective Daugenti. ECF Dkt. #1 at 30. Since he failed to raise this issue on direct appeal and failed to present it under the same constitutional theory in his Rule 26(B) action that he presents here, the undersigned recommends that the Court find that it is procedurally defaulted.

### B.      CAUSE AND PREJUDICE

As cause to excuse the procedural default of his second through sixth grounds for relief, Petitioner asserts actual innocence, the ineffective assistance of counsel, and prosecutorial misconduct. ECF Dkt. #11. He also reasserts that the evidence was insufficient to convict him and he was denied due process when the trial court barred the defense from using the decedent's statement to cross examine Lamont Foster. *Id*. at 11-15, 21-22.

The undersigned recommends that the Court decline to address Petitioner's insufficiency of the evidence and denial of due process assertions because he fails to explain how these claims constitute objective factors external to the defense that impeded his efforts to comply with Ohio's procedural rules. Petitioner merely repeats these arguments in the same manner in which he presented them as separate grounds for relief in his instant petition.

The undersigned also recommends that the Court find that Petitioner's ineffective assistance of counsel claims cannot serve as cause to excuse his procedural default because he has also procedurally defaulted those claims. Ineffective assistance of counsel can constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *Taylor v. McKee*, 649 F.3d 446, 451-452 (6th Cir. 2011). However, an ineffective assistance of counsel claim cannot establish cause to excuse a procedural

-20-

default when that claim itself is procedurally defaulted, unless a petitioner can show cause and prejudice to excuse that default.  *Id*.  In addition, the ineffective assistance of counsel claim must be presented to the state courts as an independent claim before it can serve as cause to excuse a procedural default.  *Taylor*, 649 F.3d at 451, citing *Murray*, 477 U.S. at 488-489.  In the instant case,  Petitioner failed to raise on direct appeal or in subsequent filings the ineffective assistance of counsel based upon counsel's alleged failure to present evidence that:  the decedent was a known drug seeker; the emergency room doctor diagnosed the decedent with physical signs of opium abuse; and emergency room doctor medical error which contributed to the decedent's death.  ECF Dkt. #6-1 at 191, 227-229, 275, 292-318, 384-393, 471, 518; ECF Dkt. #11 at 9-11.  Thus, Petitioner has procedurally defaulted his ineffective assistance of counsel claims.  Moreover, Petitioner presents no cause to excuse his procedural default of these ineffective assistance of counsel claims.  Accordingly, the undersigned recommends that the Court find that Petitioner's ineffective assistance of counsel claims cannot serve as cause to excuse his procedural default.

As to Petitioner's claims of prosecutorial misconduct and his denial of a right to present a defense in state court, the undersigned recommends that the Court find that Petitioner fails to show how these claims prevented him from presenting his claims to the state courts.  Accordingly, the undersigned recommends that the Court find that they cannot serve as cause to excuse his procedural default.

## C.    ACTUAL INNOCENCE

This leaves Petitioner's actual innocence claim as the only remaining avenue in which to have his otherwise procedurally defaulted claims reviewed by this Court.  Petitioner contends that he has discovered new evidence via several documents from his internet research which disproves the coroner's trial testimony as to the symptoms shown by an individual who overdoses on drugs and as to the decedent's actual cause of death.  ECF Dkt. #11 at 2-3.  Petitioner asserts that this new evidence "will show the coroner's medical opinion was not based upon proper research and that he perjured himself regarding Mr. Hamad's cause of death."  *Id.* at 4.  Petitioner surmises that the decedent's death resulted from a drug overdose which was

complicated by the actions of the emergency room doctor who failed to properly diagnose and treat the decedent.  *Id*. at 16-19.

Petitioner also presents what appears to be a separate stand-alone actual innocence claim in his first ground for relief in his federal habeas corpus petition.  ECF Dkt. #1.  He repeats the theories constructed through his internet research and additionally contends that he is actually innocent of the aggravated robbery convictions because his brother Lamont Foster has a mental illness and could not distinguish between fantasy and reality.  *Id.* at 19-21.  He also proclaims his actual innocence on the aggravated robbery convictions because his internet research allegedly shows that UPC codes like those on items discovered in his house by Detective Daugenti are not the same as fingerprints and thus contain no hidden data which allows the exact identification of a specific item.  *Id.* at 21.

The United States Supreme Court has not yet determined whether a prisoner may be entitled to federal habeas corpus relief based upon a free-standing claim of actual innocence. *McQuiggin v. Perkins*, - - U.S. - - , 133 S.Ct. 1924,  1928, 185 L.Ed.2d 1019 (2013). Nevertheless, the Court has held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar...or...expiration of the statute of limitations."  *Id*.  The Supreme Court has cautioned that actual innocence findings are rare and advises that "'a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *Id*., quoting *Schlup v. Delo*, 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) and citing *House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).  The Supreme Court stressed that "[t]he gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'"  *McQuiggin*, 133 S.Ct. at 1936, quoting *Schlup*, 513 U.S. at 316.  New evidence may be "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Schlup*, 513 U.S. at 324.  The undersigned further notes that actual innocence means factual innocence, not mere legal insufficiency.

-22-

*Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).  Actual innocence "does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."  The habeas court "must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'"  *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012), quoting *Schlup*, 513 U.S. at 327-328.

In asserting that he is actually innocent, Petitioner first states that new evidence from the victim's medical records not presented at trial showed that the gunshot wounds did not cause his death because the paraplegia that resulted from the gunshot wounds would not predispose the victim to respiratory problems.  ECF Dkt. #1 at 16-17.  He asserts that his trial counsel was ineffective because he failed to present these medical records at trial, as well as medical records showing that the victim had a history of substance abuse, was noted to be a "known drug seeker," never had prior respiratory issues, and had multiple emergency visits for pain control.  *Id.* at 16-19.  Petitioner further complains that the victim's medical records show that the emergency room physician who examined the victim on the night of his death noted that while the victim had physical signs of pneumonia and possible narcotic overdose, no mention was made of the five Fentanyl patches on the victim's body and why the physician thereafter ruled out opiate overdose.  *Id*.  He also questions the State coroner's lack of recognition of the toxicology findings for the victim which showed a lethal level of Fentanyl and the coroner's failure to comment on how the various other drugs in the victim's body, including antidepressants, interacted with Fentanyl.  *Id*. at 19-20.

Petitioner indicates that his internet research disproves the testimony of the State's coroner who testified that when people overdose on drugs, they develop "wooden chest like syndrome."  ECF Dkt. #11 at 3-15.  He alleges that his counsel was ineffective because he failed to present evidence of medical error that the emergency room doctor committed which contributed to the decedent's death.  ECF Dkt. #1 at 10-11.  He contends that his counsel wrote

to him discussing the fatal error allegedly made by the emergency room physician when the physician gave the victim heart stimulants before having him tested for drugs. *Id*. at 23. Petitioner asserts that his internet research shows that the hyperventilation that the victim presented at the emergency room could have stemmed from a Fentanyl overdose which required removal of the patches on his body and physically or verbally stimulating the patient and then administering a narcotic antagonist such as Naloxe. *Id*. at 24. Petitioner states that rather than taking these steps, the emergency room report shows that the Fentanyl patches on the victim's back were not discovered until after his death, and the emergency room physician erroneously pumped the victim full of adrenalin and treated him with Narcan. *Id*. He surmises that the emergency room physician's lack of discovery of the Fentanyl patches and error in treatment caused the victim's death. *Id*.

The undersigned recommends that the Court find that Petitioner fails to meet the stringent actual innocence standard. In order to meet this standard, Petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. While the specific documents found by Petitioner on the internet were not presented at trial, the theories underlying those documents and other supporting evidence were presented and explored by his trial counsel at trial. Trial counsel began presenting such theories to the jury in his opening statement. While not evidence in the case, counsel informed the jury as to the evidence that would be forthcoming in order to support the defense's theories that the emergency room physician may have caused the death of the victim because he believed that the victim was in cardiac arrest and injected an aperture needle into his heart, which caused the victim to stop breathing. ECF Dkt. #7-2 at 197. Defense counsel indicated that the evidence would show that the physician was not aware that the victim had five Fentanyl patches on his back at the time that he was brought into the emergency room and treated and it was not until the State coroner examined the victim after his death that the patches were discovered. *Id*. at 198. Defense counsel also informed the jury that his defense expert, Dr. Bux, would testify and explain that the victim did not die of bronchial pneumonia, but of an overdose

-24-

of prescription medications.  *Id.* at 199.  Counsel also told the jury that the evidence would show that the victim's toxicology report would show overdoses of not only Fentanyl in the victim's body, but also overdoses of Percocet, Oxycontin and other painkillers.  *Id.* at 198.

During trial, defense counsel cross-examined the victim's family physician, Dr. Van Auken, and elicited testimony that the victim was being treated for depression and the victim told him that the victim's family thought he was taking too many pain pills.  ECF Dkt. #7-4 at 186-188.  Upon questioning by defense counsel, Dr. Vanauken further recalled his medical note that in 2005, the victim's family had called and spoken with the social worker about the victim's pain pill usage and indicated that the victim was not taking good care of himself.  *Id.* at 191.  The medical notes also indicated that the social worker referred the victim to adult protective services and they sent out a home health aid.  *Id.* at 191-193.  Dr. Vanauken also referred to his medical notes to recall that the victim further was taken to the emergency room in January of 2006 due to an overdose.  *Id.* at 194.  He conveyed that the victim told him that the overdose was accidental.  *Id.*  He admitted that the victim had suffered a traumatic injury and was having great difficulty in coping with his life.  *Id.*  He further testified that the victim had been on Fentanyl patches for years and had tried pain management, but his tolerance to Fentanyl became so dependent that he would use two patches every three days starting the fall of 2006.  *Id.* at 195-196, 200.  Dr. Vanauken indicated that he had never used this course of treatment on anyone else and the victim was able to fulfill the monthly prescription for 20 Fentanyl patches and put the patches on and take them off by himself.  *Id.* at 196-198.  He explained that the victim's paralysis did not have any impact on his lungs or respiratory system.  *Id.* at 203.  He further stated that he did not measure drug levels in a patient's body because those with long-term opiate use tolerate very high dosages and could still not have pain relief.  *Id.* at 204.

Defense counsel also presented an expert, Dr. Bux, who testified that he had reviewed the victim's medical records from the shooting in 2001 to the last year of the victim's life.  ECF Dkt. #7-5 at 48-49.  Dr. Bux testified that when the victim presented to the emergency room after the shooting in 2001 and before he was administered any pain medications, drug screening was performed and it came back positive for cocaine, a metabolite morphine and marijuana.  *Id.* at 49-

50. Dr. Bux also noted that the hospital records showed that the victim had a psychotic break three days later and the psychiatrist who examined him and found him paranoid and agitated wondered if it might be drug-related or due to high doses of steroids administered to lessen his spinal cord injury.  *Id*. at 49.  Dr. Bux also indicated that later on in his hospitalization the victim admitted that he was a recreational drug user.  *Id*.

Dr. Bux further testified as to the Fentanyl patches that the victim was prescribed, noting that Fentanyl was a "very, very potent narcotic" that individuals develop a tolerance to and can become dependent upon for pain relief.  ECF Dkt. #7-5 at 51-53.  He discussed an article that he was working on concerning Fentanyl.  *Id*. at 52.  Dr. Bux explained that the use of Fentanyl can cause abdominal pain and it can affect the respiratory system by decreasing the depth and frequency of respirations which can cause one not to breathe frequently enough or deep enough and he can die.  *Id*. at 54.  He also explained that high doses of Fentanyl can cause an individual to aspirate, which can turn into aspiration pneumonia, which can cause death.  *Id*. at 52-54.  He testified that in the instant case, the victim's paralysis did not compromise his respiratory system, but the Fentanyl itself could have, and taking other narcotics in combination with Fentanyl could also cause respiratory depression.  *Id*. at 57-59, 62-64.  He also indicated that his review of the victim's medical records did not show he had been hospitalized in the past for a respiratory problem.  *Id*. at 116.

Dr. Bux further testified that the medical records showed that in 2007, the victim arrived at the hospital with severely compromised respiration, he was breathing shallowly, and he had an accelerated heart rate.  ECF Dkt. #7-5 at 65-66.  He noted that the emergency room doctor thought that the victim had pneumonia and a opiate or narcotic overdose and gave the victim a drug called Maloxin that reverses overdose.  *Id*.  at 67.  Dr. Bux reported that the records showed that the victim clinically improved but then deteriorated again and was intubated and died one hour later.  *Id*.  Dr. Bux noted that no blood screen testing was conducted and he surmised that while a physical examination was done of the victim, no physical examination could have been conducted of his back because they would have discovered the five Fentanyl patches on his back. ECF Dkt. #7-5 at 67.

Dr. Bux further indicated that he had reviewed the coroner's autopsy report which showed two unusual findings. ECF Dkt. #7-5 at 71. He first noted that the major artery of the front part of the victim's heart was removed for further pathological study at the Cleveland Clinic, but the report contained no description of what happened to the artery thereafter or any findings by the Cleveland Clinic. *Id*. at 71-72. He also indicated that a disconnect existed between the toxicology report and the autopsy findings, opinion and conclusion. *Id.* at 72. He related that the toxicology report showed depression drugs in the victim's system, such as Amitriptyline, Wellbutrin, Citalopram, as well as Diazepam, Nortriptlyine, and the Fentanyl. *Id*. at 72-73. Dr. Bux testified that the dosage of Fentanyl found in the victim's system was "an extremely high lethal dose." *Id.* at 74. Dr. Bux noted that the level of Fentanyl in the victim's body was almost ten times the level that he would expect to find. *Id*. at 75. He identified the medical report that he prepared and he opined that the victim's cause of death was a massive Fentanyl overdose and pneumonia, both of which were independent from the gunshot wounds. *Id.* at 76-77. He indicated that he did not know the manner of death because he did not know whether the victim put the Fentanyl patches on himself or whether someone else did it for him. *Id*. at 77-78. He also testified that no evidence existed in the autopsy report as to what was done with the Fentanyl patches once they were discovered on the victim's body. *Id.* at 81. On cross-examination, Dr. Bux opined that the victim's gunshot wounds and paralysis had nothing to do with his death. *Id*. at 125.

However, the State presented the testimony and report of the coroner, Dr. Galita. ECF Dkt. #7-5 at 129. Dr. Galita testified on direct examination that upon autopsy, he recovered an old bullet from the victim's left lung and five Fentanyl patches from the victim's back. *Id*. at 163-165. He indicated that the patches were submitted to the toxicology department but they were not tested. *Id.* at 141. He also testified that he sent the victim's left anterior descending artery to the Cleveland Clinic for further examination which revealed 80 percent stenosis of the artery. *Id*. at 147. He noted in his final diagnosis that the victim had severe coronary atherosclerosis. *Id*. at 153. He also testified that he examined the victim's lungs and found severe infection in both lungs which is called acute bronchopneumonia. *Id*. at 154. He indicated

that this is a serious condition that can lead to death.  *Id*. at 155.

Dr. Galita testified that Fentanyl patches continue to work and the substance in the patches continues to be absorbed for up to twelve hours after death.  ECF Dkt. #705 at 166.  He noted that he received the victim's body 33 hours after death. *Id*.  Dr. Galita indicated that tolerance level for Fentanyl varies greatly and some individuals who take Fentanyl for weeks or years can develop a "very, very high even on a toxic level of the drug or even apparently little level." *Id*. at 167.  He opined that if the victim died from only a high level of Fentanyl, the Fentanyl overdose would manifest itself by respiratory failure whereby the respiratory muscles of the chest become stiff and "it is the so-called wooden chest" and the person could not breathe properly.  *Id.* He indicated that the victim in this case did not manifest a wooden chest syndrome and only the hospital clinicians could notice such signs, but they did not mention such a sign in the victim's medical records.  *Id*. at 168.  He testified that such a person would breathe very shallowly and very hard because the chest is stiff, but the medical records in the instant case showed the victim had hyperventilation, *i.e*., he was breathing very deep and very rapid.  *Id.* at 168-169.  He said that the hyperventilation is typical of a lung infection.  *Id.* at 169.  Dr. Galita further testified, contrary to Dr. Bux's testimony, that a connection existed between the victim's paralysis and lung infections because the victim was bedridden and wheelchair bound for a long period of time which causes the oxygen in the air not to get to the blood because of the lung infection and a patient dies from the lack of oxygen.  *Id*. at 170.  Dr. Galita opined that the cause of the victim's death in the instant case was acute bronchopneumonia due to paraplegia, due to remote gunshot wound of lumbar spine with spinal cord injury, and the manner of death was a homicide while at work.  *Id*. at 172.

On cross-examination, Dr. Galita admitted that it was possible that the emergency room physician missed the five Fentanyl patches on the victim's back upon his arrival at the emergency room because the back of a patient is not normally examined.  ECF Dkt. #7-5 at 188.  He also indicated that while it was proper medical procedure to draw blood to make sure no illegal street drugs are in a person's system, he did not recall any blood being drawn in the victim's case.  *Id.* at 187-188.  Dr. Galita further testified that the pneumonia in the victim's

lungs combined with the five Fentanyl patches did not contribute to the victim's death because there was no evidence of such contribution. *Id*. at 206. He reiterated that because the victim did not have a stiff chest and was hyperventilating rather than not breathing well, it was the lung infections and not the Fentanyl patches that caused his death. *Id*. at 207. He further opined that the lung infections resulted in a homicide because the remote gunshot wound at the lumbar spine with spinal cord injury caused paraplegia which caused increased potential for lung infections because of being bedridden or wheelchair ridden. *Id*. at 207. He further testified that the past medical records did not need to show prior lung infections in order for only one such infection to be deadly. *Id.* at 208.

Dr. Galita further indicated on cross-examination that the emergency room doctor gave the victim Narcan, an antagonist for Fentanyl, and then gave him Ephedrine directly into his heart, which could cause unpredictable results. ECF Dkt. #7-5 at 208-209. Dr. Galita also testified that the amount of Fentanyl found in the victim's body was not accurate because the testing was done 33 hours after his death and the Fentanyl was released into his body after death which created an abnormally artificially high level. *Id*. at 214. He further noted that his initial opinions as to the victim's cause of death did not change after receiving medical records following his initial report. *Id*.

Petitioner's attached internet research from the World Book and Family Health are undated. ECF Dkt. #12-1 and 12-2. And the article that he attaches from the Journal of Analytical Toxicology entitled "Duragesic Transdermal Patch: Postmortem Tissue\- Distribution of Fentanyl in 25 Cases" is dated October 2000. Petitioner fails to show how these documents are "new" evidence. Moreover, as shown above, Petitioner's counsel repeatedly presented evidence and argument that the victim abused drugs, presented to the emergency room with signs of opiate overdose and the emergency room failed to discover the five Fentanyl patches on his back and failed to perform a toxicology screen. The other drugs, including antidepressants, were also identified in the victim's body. Dr. Bux presented a much different theory of the victim's death than Dr. Galita and the jury chose to believe the State's version. The fact that evidence exists that may support alternative theories of the victim's death that favor

Petitioner's assertions shows only that conflicting conclusions existed between the experts and does not establish that no reasonable juror could convict Petitioner of murder.

For these reasons, the undersigned recommends that the Court find that Petitioner fails to meet the stringent standard to establish actual innocence as to this assertion.

Petitioner also asserts that he is actually innocent because the state's "star" witness, his brother Lamont Foster, was mentally ill and had motive to testify against Petitioner.  ECF Dkt. #1 at 16-20.  He also argues that he is actually innocent because the internet research that he conducted shows that a UPC code on a product is not like a fingerprint but is a unique code to help retailers and wholesalers manage inventory and it does not contain hidden information to allow the exact identification of a specific item.  ECF Dkt. #1 at 21.

Petitioner contends that Lamont testified against him because the State offered him a deal to plead guilty to involuntary manslaughter and receive no additional prison time on top of the prison time he was already serving.  ECF Dkt. #11 at 12.  Petitioner indicates that he will supply affidavits from individuals who will attest that Lamont Foster admitted that Petitioner was not involved in the instant shooting and robbery.  ECF Dkt. #1 at 20.  Petitioner also supplies an information sheet from a company named Unique Printing & Labels, Inc. which contains information regarding UPC codes.  ECF Dkt. #1-6.

The undersigned first questions whether Petitioner's assertions concerning Lamont's plea deal with the State and his mental illness constitute new evidence.  As explained by the Ohio appellate court and supported by the transcript of the trial, defense counsel filed a motion of a suggestion of incompetence of Lamont Foster and after holding a hearing, the trial court found Lamont Foster competent to testify despite his mental illness.  ECF Dkt. #6-1 at 292, 502, 511; ECF Dkt. #7-5 at 2-36.  The jury was also made aware of Lamont's mental illness as he was questioned about his mental health condition by the State and by defense counsel.  ECF Dkt. #6-1 at 292; *see also* ECF Dkt. #7-6 at 44-51.  He was also questioned about the plea deal he had with the State in exchange for his testimony in the instant case.  *Id.*

Further, and putting aside any reliability concerns regarding the UPC fact sheet provided and providing affidavits of inmates who will attest that Lamont said that Petitioner was not

-30-

involved in the shooting and robbery, the undersigned recommends that the Court find that Petitioner has not shown that it is more likely than not that no reasonable juror would have convicted him of the murder and aggravated robbery.  ECF Dkt. #7-6 at 142.  Detective Daugenti testified that the victim originally and emphatically identified James Sheron as the person who shot him and Mr. Sheron was arrested.  *Id*. at 142-143.  However, after Mr. Sheron denied involvement and a consent search of his home revealed no evidence, Detective Daugenti tracked the use of the victim's stolen credit cards to various stores and obtained video surveillance footage showing two individuals completing purchases with the stolen credit cards after the shooting.  *Id*. at 156-166.  He also testified that a still photo of the outside parking lot showed the vehicle that the suspected individuals got into after the purchase.  *Id*. at 159.  He indicated that he received a tip from Crime Stoppers concerning Petitioner's involvement in the crimes and when he interviewed Petitioner, Petitioner put himself at the scene of the crimes, stating that he sat across from the store watching his brothers commit the crimes and he then went home.  *Id*. at 164-165, 170-171.  Detective Daugenti testified that while Petitioner told him that his brothers Lamont and Gilbert were the perpetrators of the crimes, he obtained evidence that Gilbert was at work during the time in question.  *Id*. at 161-172.  Lamont Foster admitted on the stand that he had a mental illness and he entered into a plea deal with the State for his testimony.  ECF Dkt. #7-6 at 5-10.  He explained his mental illness and his plea deal and he testified that Petitioner was involved in the robbery and heard a gunshot from behind him and saw the victim fall.  *Id*. at 8.  He then saw Petitioner "walk up on him [the victim] and pointed downward, and shot him again."  *Id*.  Evidence also showed that Petitioner was in possession of the gun used in the crimes and Petitioner's car matched the make and model of the vehicle in the still picture taken at the store.  ECF Dkt. #7-4 at 85, 130-141; ECF Dkt.#7-6 at 161-172, 190. Detective Daugenti also testified that he conducted a consent search of the home where Petitioner was living and discovered items that matched the store receipts where the stolen credit cards were used, including store tags and prices.  ECF Dkt. #7-6 at 173-178.  The record reveals that Detective Daugenti admitted that he did not process DNA or fingerprints on the items found in the house and other men besides Petitioner lived in the home where the items were found.  *Id.* at 194, 229,

236-237.  He also admitted that he did not obtain the actual credit card statement to match up the items found in the house or to compare the signature on the credit cart receipt to the handwriting of Petitioner to determine whether he was the individual who purchased the items since the store videotape did not clearly show the faces of the persons buying the items with the credit card.  *Id.* at 198, 241.  However, the jury could still convict Petitioner of the crimes based upon the testimony of Lamont Foster and the evidence showing that Petitioner was at the scene of the crimes, lied about his brother Gilbert's involvement in the crimes, possessed the gun used in the crimes, had a vehicle that matched the videotape footage of the store in which two men were taped using the victim's stolen credit cards, and Petitioner had in his house the same items identified on the store receipts from the same stores with the same prices.

Accordingly, the undersigned recommends that the Court find that Petitioner fails to establish his actual innocence.

## VII.   PENDING MOTIONS (ECF Dkt. #s 13, 14, 16)

On September 19, 2013, Petitioner filed the instant motion for the appointment of counsel and a motion to expand the record.  ECF Dkt. #s13, 14.  On September 23, 2013, Respondent filed a brief opposing the motions.  ECF Dkt. #15.  On October 10, 2013, Petitioner filed a motion requesting that the Court require Respondent to complete the record.  ECF Dkt. #16.

In light of the undersigned's above recommendations, the undersigned consequently recommends that the Court DENY these motions as MOOT.  ECF Dkt. #s 13, 14, 16.

## VIII.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court DISMISS Petitioner's instant federal habeas corpus petition because he has procedurally defaulted all of his grounds for relief and has not met his burden of establishing cause and prejudice and his actual innocence.  The undersigned further recommends that the Court DENY all of Petitioner's pending motions as MOOT.  ECF Dkt. #s 13, 14, 16.

Date: December 16, 2013                    */s/George J. Limbert*
                                          George J. Limbert
                                          United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Crim. P. 59.  Failure to file objections within the specified time constitutes a WAIVER of the right to appeal the Magistrate Judge's recommendation.  *Id.*